JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 1567

-------------------------------------------------------------------x

ALLEN BROWN,

                           Plaintiff,

              -v-

THE CITY OF NEW YORK; New York City Police
Department Sergeant ROBERT KING, in his individual
capacity; New York City Police Department Sergeant
ANNETTE FIGUEROA (Shield No. 03228), in her
individual capacity; New York City Police Department
Officer WILLIAM GONZALEZ (Shield No. 09917), in
his individual capacity;

                          Defendants.

-------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

Index No. 15-CV-_____



Plaintiff ALLEN BROWN, through his attorney Robert M. Quackenbush of Rankin &

Taylor, PLLC, as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and
   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights
   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff ALLEN BROWN's constitutional rights were violated when officers of the New
   York City Police Department ("NYPD") unconstitutionally and without any legal basis used
   unlawful force against Mr. BROWN, arrested him, and caused him to be prosecuted – all
   based upon the officers' fabricated, sworn allegations which are flatly contradicted by
   surveillance video of the incident.

3. By reason of defendants' actions, including their unlawful arrest and subsequent initiation of a baseless prosecution, Mr. BROWN was deprived of his rights guaranteed by the Fourth and Fourteenth Amendments.

4. Accordingly, Mr. BROWN seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Mr. BROWN's claim arose in Bronx County, within the confines of this judicial district.

7. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8. Plaintiff ALLEN BROWN was at all times relevant to this action a resident of the County of Bronx in the State of New York.

9. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

10. Defendants NYPD Sergeant ("Sgt.") ROBERT KING, Sgt. ANNETTE FIGUEROA (Shield No. 03228), and Officer ("P.O.") WILLIAM GONZALEZ (Shield No. 09917) (referred to

herein collectively as "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

11. The officer-defendants are being sued herein in their individual capacities.

12. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

13. The incident here at issue occurred on November 2, 2012 at approximately 12:30 a.m. and thereafter inside the lobby of 3 West 192nd Street in Bronx County.

14. At approximately the date, time, and location above, Mr. BROWN left his friend's second-floor apartment with the intention of going downstairs and outside.

15. At the time Mr. BROWN was walking down the stairs towards the lobby, the officer-defendants were detaining an unknown male whom they had already rear-cuffed.

16. Sgt. FIGUEROA stopped Mr. BROWN, asked what was inside the cup that Mr. BROWN was holding, and took the cup out of Mr. BROWN's hand.

17. With her other hand, Sgt. FIGUEROA grabbed Mr. BROWN's wrist and pulled him towards the wall next to the stairs.

18. Mr. BROWN's cup contained only pineapple juice.

19. When Sgt. FIGUEROA grabbed Mr. BROWN's wrist, Sgt. KING and P.O. GONZALEZ pushed Mr. BROWN against the wall.

20. Over the next several seconds, Sgt. KING and P.O. GONZALEZ grabbed Mr. BROWN by the scruff of his shirt under his chin.

21. While one of the male officer-defendants continued to hold Mr. BROWN against the wall, the larger male officer-defendant punched Mr. BROWN in the face.

22. Sgt. FIGUEROA placed Mr. BROWN's cup on the stairwell.

23. Sgt. FIGUEROA thereafter assisted her fellow officers in beating Mr. BROWN.

24. The officer-defendants wrestled Mr. BROWN to the ground, used pepperspray upon him, and otherwise used force upon him.

25. The officer-defendants rear-cuffed Mr. BROWN, and Sgt. KING and P.O. GONZALEZ led him out of the building.

26. None of the officer-defendants took Mr. BROWN's cup with them or even examined its contents after Sgt. FIGUEROA placed it on the stairs.

27. The entire incident was recorded on color surveillance video.

28. While in custody, Mr. BROWN was taken to North Central Bronx Hospital to treat his injuries which included, *inter alia*, a laceration to his left eyebrow which required stitches to close.

29. At arraignment, based on P.O. GONZALEZ's sworn allegations which were supplied at least in part by Sgt. KING, Mr. BROWN was charged with resisting arrest, obstruction of governmental administration in the second degree, disorderly conduct and harassment in the second degree.

30. In nearly all material respects, the sworn allegations of P.O. GONZALEZ are contradicted by the video of the incident.

31. At arraignment, the criminal court judge, the Honorable Ann Scherzer, wrote on the court's file folder that "[Mr. BROWN] has visible injuries[.] Says was beaten by police."

32. The criminal court released Mr. BROWN on his own recognizance.

33. On or about December 11, 2012, the District Attorney's office filed a superseding accusatory instrument, this time sworn to by Sgt. FIGUEROA based on her alleged personal knowledge of the incident.

34. In nearly all material respects, the sworn allegations of Sgt. FIGUEROA are contradicted by the video of the incident.

35. As a result of the incident, about a week after Mr. BROWN's arraignment and subsequent release on his own recognizance, a parole hold was placed on Mr. BROWN resulting in him being taken into custody.

36. P.O. GONZALEZ testified against Mr. BROWN at his parole revocation hearing consistent with the complete falsehoods set forth in the criminal court accusatory instruments, thereby causing the hearing officer to revoke Mr. BROWN's parole.

37. On June 13, 2013, the criminal court granted Mr. BROWN's motion to dismiss the charges against him.

38. Nevertheless, due to the officer-defendants' conduct in causing Mr. BROWN's parole to be revoked, he continued to remain in custody even after the dismissal of the criminal charges against him.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against the officer-defendants*)

39. Mr. BROWN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

40. The officer-defendants, under color of state law, subjected Mr. BROWN to the foregoing acts and omissions, thereby depriving Mr. BROWN of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from having police officers fabricate evidence against him; (f) freedom from malicious prosecution by police; and (g) freedom from abuse of process.

41. The officer-defendants' deprivation of Mr. BROWN's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against the CITY OF NEW YORK*)

42. Mr. BROWN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

43. The officer-defendants' acts and omissions described above were carried out pursuant to the CITY's overlapping customs and practices which were in existence on November 2, 2012

and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

44. The acts complained of were carried out by the officer-defendants in their capacities as police officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

45. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Using excessive force on individuals who have already been restrained or are otherwise compliant;

   b. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

   c. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

       i. in order to protect other officers; and/or

       ii. in order to meet said productivity goals; and/or

   d. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   e. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers; and

   f. Retaliating against officers who report police misconduct.

46. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

   a. People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do

not erode the public's trust in law enforcement... To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

b. <u>People v. Arbeedy</u>, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

c. <u>Thompson v. City of New York</u>, 10-CV-3603 (ARR) (SMG) (E.D.N.Y.) (while arrestee is handcuffed and compliant, police officers use their Asp, or expandable metal baton, to beat plaintiff and also apply Mace to his face without cause);

d. <u>Zabala v. City of New York</u>, 3771/2010 (Sup. Ct., Kings Co.) (police officers severely beat and TASER a compliant, prone, bloodied and semi-conscious suspect after he had surrendered);

e. <u>Ashe v. City of New York</u>, 09-CV-9696 (GBD) (THK) (S.D.N.Y.) (police officers beat and use Mace upon arrestees even though they were both already handcuffed and compliant);

f. <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force);

g. <u>Moise v. City of New York</u>, 09-CV-9855 (DC) (JLC) (S.D.N.Y.) (police officers beat and use Mace upon a compliant arrestee while he was already in handcuffs);

h. <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

i.  Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[1]

j.  Colon v. City of New York, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

k.  Bryant v. City of New York, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[2]

l.  Williams v. City of New York, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

m.  McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

n.  Avent v. City of New York, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

o.  Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

---

[1]    For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

[2]    For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

p. <u>Dotson v. City of New York</u>, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

q. <u>Nonnemann v. City of New York</u>, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

r. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

s. <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified).

47. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[3]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[4]

---

[3]   Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[4]   Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[5]

d. The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[6]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[7]

f. In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[8]

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also

---

[5]   *Id.*

[6]   James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/ 2010-11-08_cops_told_to_meet_quotas.html.

[7]   Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

[8]   Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[9]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[10] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[11]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[12]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

---

[9]    Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/ 12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[10]    William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; *see also* Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[11]    Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02- 19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[12]    *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[13]

48. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[14]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

---

[13] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

[14] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in
Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a
"widespread... custom or policy by the city approving illegal conduct" such as lying
under oath and false swearing, Commissioner KELLY acknowledged, "When it
happens, it's not for personal gain.  It's more for convenience."[15]

d.  Regarding defendant CITY's tacit condonement and failure to supervise, discipline or
provide remedial training when officers engage in excessive force, the Civilian
Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that
is responsible for investigating and issuing findings on complaints of police abuse and
misconduct.[16]  When it does, however, Police Commissioner KELLY controls
whether the NYPD pursues the matter and he alone has the authority to impose
discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-
quarter of officers whom the CCRB found engaged in misconduct received
punishment more severe than verbal "instructions." Moreover, the number of CCRB-
substantiated cases that the NYPD has simply dropped (i.e., closed without action or
discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in
2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to
prosecute 40% of the cases sent to it by the CCRB in 2009.[17] As a result, the
percentage of cases where the CCRB found misconduct but where the subject officers
were given only verbal instructions or the matter was simply dropped by the NYPD
rose to 66% in 2007. Substantiated complaints of excessive force against civilians
accounted for more than 10% of the cases that the NYPD dropped in 2007 and
account for more than 25% of cases dropped in 2008.[18]

e.  In 2012, out 5,760 complaints taken up by the CCRB, the CCRB substantiated only
967     (about     9%).     See,     CCRB     Annual     Appendix     2012, available
at http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_appendix_2012.pdf.  A
former employee of the CCRB has reported that there is strong and explicit
institutional pressure within the CCRB to keep the number of unsubstantiated cases to
a minimum. See David Noriega, The Thin Blue Lie, New Inquiry, available at

---

[15]     Oren Yaniv and John Marzulli, Kelly Shrugs Off Judge Who Slammed Cops, New York Daily News,
December   2,   2009,   available   at   http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-
02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[16]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594
(about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only
507   (about   5%).   See,   CCRB   Jan.-Dec.   2007   Status   Report   at   p.   19,   available   at
http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated
complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice
in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories,
inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by
themselves or fellow officers, supervisors and/or subordinates.

[17]     Christine Hauser, Few Results for Reports of Police Misconduct, New York Times, October 5, 2009, at
A19.

[18]     Daily News, Editorial: City Leaders Must Get Serious About Policing the Police, August 20, 2008.

http://thenewinquiry.com/essays/the-thin-blue-lie/. From 2002 through 2010, in 92 percent of the substantiated cases referred to the NYPD by the CCRB, the NYPD did not follow the CCRB's recommendation that officers with substantiated claims of misconduct be disciplined with the most serious penalty of charges and specifications.[19] In 2012, the NYPD issued only verbal or written "instructions" to the subject officer in 62 percent of the substantiated complaints referred to them by the CCRB, and declined to take any action whatsoever in 21 percent of such cases.[20]

    f.    This practice has continued under NYPD Commissioner William J. Bratton. In the first sixth months of 2014, the NYPD declined to sanction officers in over 25 percent of cases in which the CCRB substantiated allegations of misconduct. That rate is near the high end of what was seen during the last years of the administration of former Mayor Michael Bloomberg, when Mayor Bloomberg and Commissioner Kelly were generally hostile to external oversight.[21]

49. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

    a.    The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[22]

> [...]

---

[19]    "Diminished Accountability: How Discipline for Police Misconduct is Downgraded by the NYPD," Citizens Union of the City of New York, March 2012, available at http://www.citizensunion.org/www/cu/site/ hosting/Reports/CUReport_AccountabilityPoliceMisconduct.pdf.

[20]    CCRB Annual Report 2012, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/ ccrb_annual_2012.pdf.

[21]    J. David Goodman, *Bratton Spurned 25% of Board's Police Misconduct Findings in First Half of '14,* N.Y. Times, Aug. 26, 2014, at A19.

[22]    Mollen Commission Report, p. 36.

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[23]

b. In June of 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[24]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[25] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the

---

[23]    Mollen Commission Report, pp. 40-41.

[24]    Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[25]    Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[26]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[27]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

---

[26]   *Id.*

[27]   John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[28]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[29]

f.  In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[30] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[31]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations

---

[28]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[29]    John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[30]    In sum, the CITY has paid out $80,000 to settle four federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_out_35g_to_granny_busted_as_hooker.html.

[31]    *Id.*

reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[32]

50. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

   a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

   b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

   c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

51. All of the foregoing acts by defendants deprived Mr. BROWN of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraph "40".

52. Defendant CITY knew or should have known that the acts alleged herein would deprive Mr. BROWN of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

53. Defendant CITY is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

---

[32]   David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

54. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including but not limited to former NYPD Commissioner Raymond Kelly, did not take steps to terminate these policies, practices and/or customs, did not discipline individuals who engaged in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

55. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the officer-defendants felt empowered to use unlawful force against Mr. BROWN, arrest him without probable cause, initiate a baseless prosecution against him based upon their knowingly-false yet sworn statements – all without fear of discipline or other repercussions from their employer.

56. Mr. BROWN's injuries were a direct and proximate result of defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

## JURY DEMAND

57. Mr. BROWN demands a trial by jury in this action on each and every one of his damage

claims.

    **WHEREFORE**, Mr. BROWN demands judgment against the defendants individually

and jointly and prays for relief as follows:

a.     That he be compensated for violation of his constitutional and statutory rights, pain, suffering, mental anguish, and humiliation; and

b.     That he be awarded punitive damages against the officer-defendants; and

c.     That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.     For such other further and different relief as to the Court may seem just and proper.

Dated:     New York, New York
               March 3, 2015

                           Respectfully submitted,

By:     _Robert M. Quackenbush_
        Robert M. Quackenbush
        Rankin & Taylor, PLLC
        *Attorneys for the Plaintiff*
        11 Park Place, Suite 914
        New York, New York 1007
        t: 212-226-4507
        f: 212-658-9480
        e: robert@drmtlaw.com